

Page 2

## MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
## SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District **Eastern District of Virginia** |
|---|---|
| Name (under which you were convicted): **Arthur Lee Monroe Jr** | Docket or Case No.: **3:22-CR-00147** |
| Place of Confinement: **FCI Beckley** | Prisoner No.: **376 41 510** |
| UNITED STATES OF AMERICA | Movant (include name under which convicted) |
| v. **Arthur Lee Monroe Jr** | |

### MOTION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: **United States District Court Eastern District of Virginia 701 East Broad Street, Suite 3000 Richmond, Virginia 23219**

   (b) Criminal docket or case number (if you know): **3:22-CR-00147**

2. (a) Date of the judgment of conviction (if you know): _____

   (b) Date of sentencing: **July 5, 2023**

3. Length of sentence: **84 months**

4. Nature of crime (all counts): **9.22(a)** _____

   _____

   _____

   _____

   _____

5. (a) What was your plea? (Check one)

   (1) Not guilty ☐     (2) Guilty ☑     (3) Nolo contendere (no contest) ☐

   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to? _____

   _____

   _____

   _____

6. If you went to trial, what kind of trial did you have? (Check one)     Jury ☐     Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?     Yes ☐     No ☑

Page 3

8. Did you appeal from the judgment of conviction?                    Yes ☐         No ☑

9. If you did appeal, answer the following:

(a) Name of court: _____

(b) Docket or case number (if you know): _____

(c) Result: _____

(d) Date of result (if you know): _____

(e) Citation to the case (if you know): _____

(f) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(g) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☐  No ☑

If "Yes," answer the following:

(1) Docket or case number (if you know): _____

(2) Result: _____

_____

(3) Date of result (if you know): _____

(4) Citation to the case (if you know): _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ☐  No ☑

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐  No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐  No ☐

(7) Result: _____

(8) Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition:      Yes ☐  No ☐

(2) Second petition:   Yes ☐  No ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

_____

_____

_____

Page 5

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground.

GROUND ONE: Ineffective assistance of Counsel

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Defense counsel failed to advise client (me) the burden the government had to prove to find a guilty verdict. If had not been for that failing, I would have proceeded to trail on behalf of Rahaif v United States 139 S.ct 2191 (2019), Waters v United States 4th circuit Automatic Reversal. Counsel failed to advise me of what the jury needed to prove a guilty verdict. If so I would have proceeded to trail. Counsel also neglected to show or let me hear evidence against me. Defense Counsel failed to argue that I was not punished (or imprisoned) a year or more for my drug trafficking charge (a felony is a charge that you are imprison a year or exceeding a year), I was under the "first time offender program for my possession charge (which would have been dismissed upon successful completion) Any other felony came from my Juvenile record, which I did not know could be use against you 16 years later. I also had no knowledge of a fire arm in vehicle Rahaif v United States, Water v United States.

(b) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____
_____
_____

(c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____
_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____
_____
_____

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

Page 6

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:_____

_____

Docket or case number (if you know):_____

Date of the court's decision:_____

Result (attach a copy of the court's opinion or order, if available):_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this

issue: _____

_____

_____

_____

_____

GROUND TWO: My Sixth amendment right was violated. Courts failed to have Me Mentally evaluated, despite me notifying the courts I was on psychological Medicine.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Defense Counsel aware of my Mental State, and me being on psychological Medicine, failed to file a Motion to get me mentally evaluated, thus engaging deficiently and prejudicely violating my sixth amendment right. I was prescribed medicine for hearing voices before and after offense date. The same voices told me "to go" Which I informed the officer. Because of my mental health I should not been enhanced 2points for fleeing the Scene, Which Counsel failed to point out. I also have a history of depression, PTSD, anxiety and being Suicidal. Counsel failed to inform the Court of this matter, consequently not allowing the judge a chance to grant a downward departure based on Mental Health.

(b) Direct Appeal of Ground Two:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

(c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:_____

Name and location of the court where the motion or petition was filed:_____

_____

Docket or case number (if you know):_____

Date of the court's decision:_____

Result (attach a copy of the court's opinion or order, if available):_____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:_____

_____

Docket or case number (if you know):_____

Date of the court's decision:_____

Result (attach a copy of the court's opinion or order, if available):_____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____

GROUND THREE: Courts erred when calculated My criminal history points

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): My drug possession charge at the time of the offense was still pending

Page 8

under the "first offender program," so it should have not been calculated in my criminal history points. Two points were added to my criminal history points for being on probation, which should be obsolete because the United States Sentencing Commission done away with adding two point for being on probation. Since Trafficking Cocaine is a felony in the State of North Carolina, and a felony is a charge punishable by an imprisonment of a year or more, and I was not Sentence to a year or more of imprisonment the courts erred in giving me felony points for this in my criminal history category. If ~~that~~ had not, I would have been setence in category 5 instead of category 6.

**(b) Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐  No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____

_____

_____

**(c) Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐  No ☐

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition:_____

Name and location of the court where the motion or petition was filed:_____

_____

Docket or case number (if you know):_____

Date of the court's decision:_____

Result (attach a copy of the court's opinion or order, if available):_____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐  No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐  No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐  No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:_____

_____

Docket or case number (if you know):_____

Date of the court's decision:_____

Page 9

Result (attach a copy of the court's opinion or order, if available): _____
_____
_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____
_____
_____
_____
_____

**GROUND FOUR:** The failing of counsel to properly advise Petitioner has led to a manifest of injustice and violated the Petitioner's Due process rights. Strickland v. Washington.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): Defense Counsel forced me to plea guilty. He instructed if I didn't take the plea at that time I would not be awarded the three point reduction for acceptance of responsibility and taking plea in a timely manner. A timely manner is any time before trail. He also failed to notify me only the judge could deny this opportunity. Defense Counsel misled me into believing the only way to receive a downward departure was to assist the government, which I refused. Consequently, prompting counsel to not ask for a departure, based on childhood, mental health, how I grew up, or age at the time of my first offenses. It was also misinformed to me that the Eastern district of Virginia Federal court does not agree to "11 C.1 pleas" which is Federally allowed and granted to other defendents tried in this Court. He lied numerous times to his Client.

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why: _____
_____
_____

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____
_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available):_____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❑  No ❑

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❑  No ❑

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❑  No ❑

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:_____

_____

Docket or case number (if you know):_____

Date of the court's decision:_____

Result (attach a copy of the court's opinion or order, if available):_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:_____

_____

_____

_____

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court?  If so, which ground or grounds have not been presented, and state your reasons for not presenting them: All six grounds. I ask Counsel Fernando Groene to file appeal or Motion he refused And I just became aware recently of Court cases, United States Sentence Commission revision of policy, and ways Counsel can be deemed deficient and ineffective.

_____

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging? Yes ❑   No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised._____

_____

_____

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Fernando Groene

(b) At arraignment and plea: Fernando Groene

(c) At trial: _____

(d) At sentencing: Fernando Groene

(e) On appeal: _____

(f) In any post-conviction proceeding: _____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time? Yes ☐ No ☑

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?        Yes ☐ No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: _____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?        Yes ☐ No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:
  A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of —
      (1) the date on which the judgment of conviction became final;
      (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;
      (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
      (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Page 13

Therefore, movant asks that the Court grant the following relief: from 2 point enhancment for fleeing the Scene, relief from Sentence opposed

or any other relief to which movant may be entitled.

*forma Pauperis*

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion Under 28 U.S.C. § 2255 was placed in the prison mailing system on July 2, 2024 _____ (month, date, year).

Executed (signed) on July 2, 2024 (date).

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion. _____
_____
_____

\* \* \* \* \*

Ground Five:
   Petitioner asserts that the District Court also failed to consider correctly my juvenile record to apply this my sentence unsupported by 3582(a)(2).

Supporting Facts: The bipartisan United States Sentencing Commission revised its policy statement on age permitting judges to downward depart based on age at the time of past and current offenses, in light of todays richer understanding of the science and data So surrounding youthful individuals, including recognition that cognitive changes lasting into the mid-20's affects individual behavior, culpability; and the age-crime curve. I was 16 years of age when I was found guilty of four felonies they used against my criminal history points

Ground 6:

9.22g being unconstitutional based on the two part test established in Supreme Court case "Bruen," 597 U.S. 1, as well as finding(s) in Heller, Bullock, Range, Duarte v. United States 22-50048, and a slew of recent court proceeding and ask for grounds of relief "See attachment"

Attachment

U.S. District Court
Eastern District of Virginia

United States of America,                    Case No. 3:22-CR-00147
            Plaintiff,

V.

Arthur Lee Monroe Jr.
            Defendant.


        Now comes Movant in the above caption case

requesting this Honorable Court vacate his conviction and

Sentence as it pertains to the recent United States

Supreme Court ruling(s) concerning 922(g)(1) and 924(a)(2)

These offenses violates the second Amendment under the

two-part test established in Bruen, 597 U.S. 1, as

well as finding(s) in Heller and a flood of supportive cases.

The United States Supreme Court continues


                Ground six

to rule on protecting the rights of "The People" in cases of Second Amendment rights and The Constitution. For the reasons herein attached brief and memorandum and supporting rulings of The Courts, Movant humbly request This Honorable Court vacate his Conviction and sentence.

Respectfully Submitted,
Arthur Lee Monroe Jr.

## Argument

I.    IN *NEW YORK STATE RIFLE & PISTOL ASS'N, INC. V. BRUEN*, 597 U.S. 1 (2022), THE SUPREME COURT ESTABLISHED A TEST FOR WHETHER A LAW VIOLATES THE SECOND AMENDENT: IF THE TEXT OF THE AMENDMENT COVERS THE CONDUCT THAT THE LAW PROSCRIBES, THE GOVERNMENT MUST SHOW THE LAW IS CONSISTENT WITH DISTINCTLY SIMILAR LAWS OR REGULATIONS THAT WERE COMMONPLACE AROUND THE TIME THE SECOND AMENDMENT WAS ADOPTED. UNDER THIS FRAMEWORK, 18 U.S.C. § 922(g)(1) IS FACIALLY UNCONSTITUTIONAL, AND Monroe CONVICTION CANNOT STAND.

The Second Amendment reads "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST., 2D AMEND. Congress permanently barred felons from possessing firearms in 18 U.S.C. §§ 922(g)(1) and 924(a)(2). This offense violates the Second Amendment under the two-part test established in *Bruen*, 597 U.S. 1.

A court first must consider whether the challenged law proscribes "conduct" that the plain text of the Second Amendment protects. *Id.* at 2126. If the answer is yes, then the law is presumptively unconstitutional, and the government bears the burden of demonstrating that the law is consistent with the tradition of firearms regulations around the time the Second Amendment was ratified. *Id.* Monroe's offense of conviction fails this test, because it contravenes the plain text of the

13

Second Amendment and is inconsistent with the founding-era tradition of firearms regulations.

Before discussing the merits of the *Bruen* issue, Monroe preemptively addresses four additional points sometimes suggested as barriers to relief – the standard of review, the policy underpinnings of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), Supreme Court dicta regarding "law abiding citizens," *Bruen*, 597 U.S. at 9, and "longstanding prohibitions" on firearm possession, *Heller*, 554 U.S. at 635, and whether *Rozier*, 598 F.3d 768, remains binding Circuit law in the wake of *Bruen*.

   A. Because Monroe Second Amendment Claim Is Jurisdictional, this Court Reviews the claim *De Novo*.

It might be argued that Monroe cannot satisfy the plain error standard since that standard requires a binding decision directly on point, and neither the Supreme Court nor this Court has published a decision finding 18 U.S.C. § 922(g)(1) violates the Second Amendment. But Monroe does not have to satisfy the plain error standard.

This is because the constitutionality of § 922(g)(1) under the Second Amendment is jurisdictional. *Class*, 583 U.S. at 179. In *Class*, the defendant had pleaded guilty to violating 40 U.S.C. § 5104(e)(1), which bars individuals from carrying firearms on the grounds of the Capitol building, and argued for the first

14

time on appeal that the statute of his conviction violated the Second Amendment. The Supreme Court held that his guilty plea did not waive this claim, in part because the nature of his claim "challenge[d] the Government's power to criminalize [his] (admitted) conduct." *Class*, 583 U.S. at 804. Moreover, unlike the types of rights generally waived by a guilty plea, Class's constitutional challenge of the statute implicated " 'privileges which exist beyond the confines of the trial.' " *Id.* (quoting *Mitchell v. United States*, 526 U.S. 314, 324 (1999)); *see also Blackledge v. Perry*, 417 U.S. 21, 30 (1974) (excepting from general rule that guilty plea waives antecedent claims, those claims that implicate "the very power of the State" to prosecute the defendant).

Monroe makes the exact sort of claim that Mr. Class made. He argues that § 922(g)(1) violates the Second Amendment. That is, the Second Amendment deprives Congress of the power to criminalize his possession of the firearm based on his status as a convicted felon.

The jurisdictional nature of his claim precludes a deferential standard of review that turns on the existence of pre-existing case law, the extent of prejudice to the defendant, or the discretion of this Court. "[J]urisdictional errors are not subject to plain- or harmless-error analysis." *McCoy v. United States*, 266 F.3d 1245, 1249 (11th Cir. 2001). A litigant cannot provide jurisdiction that does not exist by

forfeiting an objection, any more than they could by affirmatively waiving the issue. And " 'parties cannot waive the application of the correct law or stipulate to an incorrect legal test.' " *United States v. Dawson*, 64 F.4th 1227, 1239 (11th Cir. 2023) (*quoting Jefferson v. Sewon Am., Inc.,* 891 F.3d 911, 923 (11th Cir. 2018)). Hence, in *Dawson,* the Court rejected the government's contention that plain error review applied to the defendant's rule-of-lenity argument, made for the first time on appeal. *Id; cf. United States v. Iguaran*, 821 F.3d 1335, 1336 (11th Cir. 2016) ("The district court's subject matter jurisdiction is a question of law that we review *de novo* even when it is raised for the first time on appeal[.]")

B. Gun Control Policy Arguments Are Irrelevant.

It should go without saying, the pro- and anti- gun control policy arguments that have percolated around the country for decades, some of which undoubtedly motivated felon disarmament laws like 18 U.S.C. § 922(g)(1), play no role in the analysis. Congress's policies cannot displace the judgment that the framers of the Constitution made when they adopted the Second Amendment. *See Heller,* 554 U.S. at 635 (The Second Amendment is "the very product of an interest balancing by the people—which [the dissent] would now conduct for them anew."); *id.* at 634 ("[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis

whether the right is really worth insisting upon"); *id*. ("[a] constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all."); *cf. United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023), *cert. granted*, 143 S.Ct 2688 (2023) ("The question presented in this case is not whether prohibiting the possession of firearms by someone subject to a domestic violence restraining order is a laudable policy goal.")

### C. Language from *Heller* and *Bruen* Implying that Felons Do Not Have Second Amendment Rights Was Dicta.

In a number of decisions, courts have seized on several phrases used by the Supreme Court in dicta, to support a conclusion that only "law-abiding citizens" retain their Second Amendment right. *Heller*, 554 U.S. at 635; *see, e.g., United States v. Tribble*, No. 2:22-CR-85, 2023 WL 2455978, at *2 (N.D. Ind. Mar. 10, 2023).

In responding, Monroe first recounts under this subheading how the phrase "law-abiding" and similar language in the relevant Supreme Court precedents is dicta. In the next section, he concedes that *Rozier* made this dicta Circuit law, but explains how *Bruen* abrogated *Rozier*. In subsequent sections, he argues that whether a person is "law-abiding" is not relevant to the textual analysis required by *Bruen* Step One, and does not satisfy the government's burden at Step Two of demonstrating a founding-era body of law distinctly similar to § 922(g)(1).

17

"A holding consists of those propositions along the chosen decisional path or paths of reasoning that are (1) actually decided, (2) are based upon the facts of the case, and (3) lead to the judgment." Michael Abramowicz & Maxwell Stearns, *Defining Dicta*, 57 Stan. L. Rev. 953, 961 (2005). Under this framework, the "law-abiding citizens" and "longstanding prohibitions" passages are not holdings.

First, the *Heller* Court did not purport to "actually decide" how the Second Amendment applied to non-law-abiding citizens. Abramowicz & Stearns, *supra* at 961. It explicitly declined to pursue "an exhaustive historical analysis . . . of the full scope of the Second Amendment[,]" and left non-law-abiding citizens "to future evaluation[.]" *Heller*, 554 U.S. at 626, 635. Thus, by limiting the question presented to "law-abiding citizens" the Court did not answer questions not presented.[1]

---

[1] To treat the dicta as holding raises more questions than it answers. *See Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) ("[t]he constitutionality of felon dispossession was not before the court in *Heller*, and because it explicitly deferred analysis of this issue, the scope of its assertion is unclear."); *Range v. Attorney General*, 69 F.4th 96, 102 (3d Cir. 2023) ("[T]he phrase 'law-abiding, responsible citizens' is as expansive as it is vague.") Then-judge Barrett asked "does 'presumptively lawful' mean that such regulations are presumed lawful unless a historical study show otherwise? Does it mean that as-applied challenges are available? Does the Court's reference to 'felons' suggest that the legislature cannot disqualify misdemeanants from possessing guns? Does the word 'longstanding' mean that prohibitions of recent vintage are suspect?" *Kanter*, 919 F.3d at 453-454. And how would courts apply the other qualifiers in such a holding — "ordinary," *Bruen*, 597 U.S. at 9, and "responsible"? *Heller*, 554 U.S. at 635. "Americans have widely divergent ideas about what is required for one to be considered a 'responsible' citizen." *Range*, 69 F.4th at 102.

18

*Heller* initially referenced "law-abiding" citizens in characterizing the holding of *United States v. Miller*, 307 U.S. 174 (1939) "to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, . . . ." *Heller*, 554 U.S. at 625. It was talking about "*what* types of weapons *Miller* permits," not which persons the Second Amendment protects. *Id*. at 624 (emphasis in original.)

It next used the phrase in saying "the Federal Government did not significantly regulate the possession of firearms by law-abiding citizens." *Id*. at 625. This was not framed as part of its holding, or as a dispositive part of its analysis, and, indeed, the Court's historical review did not mention "law-abiding." That review was geared towards ascertaining whether the right, as originally understood, was connected to militia service. *Id*. at 605-619.

Its final use of the term "law-abiding" was in the statement: "whatever else it leaves to future evaluation, [the Second Amendment] surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. at 635. This statement explicitly declined to delineate the outer limits of the Second Amendment, instead suggesting that the floor of the Second Amendment's protection was of law-abiding citizens for self-defense in the

19

home. (Hence, *Bruen* could subsequently hold that the Second Amendment is *not* limited to the "defense of hearth and home," without overturning *Heller*. *Bruen*, 142 S.Ct. at 2122.)

Likewise, although *Bruen* repeated the phrase "ordinary, law-abiding citizens" throughout the decision, as in *Heller*, these qualifiers played no role in its analysis other than to limit the holding to the issue framed by the parties. *See, e.g.*, *Bruen*, 597 U.S. at 9 ("petitioners and respondents agree that ordinary, law-abiding citizens have a similar right to carry handguns publicly for their self-defense.") The Court did not purport to make law about how the Second Amendment applied to non-law-abiding citizens, who were not implicated by the facts of the case. And surely it was not holding that only persons that a court deems "ordinary" have Second Amendment rights.

Second, the *Heller* and *Bruen* Courts had no reason, based on the facts of these cases, to decide how the Second Amendment applied to non-law-abiding citizens. "[T[he criminal histories of the plaintiffs in *Heller*, *McDonald*[*v. City of Chicago*, 561 U.S. 742 (2010)], and *Bruen* were not at issue in those cases." *Range v. Attorney General*, 69 F.4th 96, 101 (3d Cir. 2023).

And third, even if the Court in these cases had more thoroughly outlined how the text-and-history test would apply to such persons, this still would have been

20

dicta. It was unnecessary to determine the rights of non-law-abiding citizens to resolve *Heller* and *Bruen*. In fact, the Court did not have jurisdiction to determine the constitutionality of a statute not implicated by these cases. *United States v. Raines*, 362 U.S. 17, 21 (1960) (Federal courts have 'no jurisdiction to pronounce any statute, either of a state or of the United States void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of the litigants in actual controversies."); *cf. Edwards v. Prime, Inc.*, 602 F.3d 1276, 1298 (11th Cir. 2010) ("We have pointed out many times that regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case.")

As to "longstanding prohibitions," *Heller* deferred analysis, stating "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." 554 U.S. at 635. Numerous courts have held[2] this statement was precautionary, played no role in

---

[2] *See, e.g., United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010) (characterizing that language in *Heller* as dicta); *Tyler v. Hillsdale County Sheriff's Department*, 837 F.3d 678, 686-87 (6th Cir. 2015) (refusing to give "dictum" from *Heller* "conclusive effect"); *Range*, 69 F.4th at 101 (concluding the Court's "references to 'law-abiding, responsible citizens' were dicta."); *Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019) ("However, the Court never actually addressed the historical pedigree of felon dispossession laws. Accordingly, we have refused to read too much into the Court's 'precautionary language.'"); *United States v. Bullock*, ___F.Supp.3d___, 2023 WL 4232309, *17-*18 (S.D. Miss. June 28, 2023).

21

the Court's analysis, and was unnecessary to the holding. It was classic dicta, as Justice Thomas later recognized. *Voisine v. United States*, 579 U.S. 686, 715 (2016) (Thomas, J., dissenting on other grounds).[3] By limiting the question presented to "ordinary, law-abiding citizens" the Court did not answer questions not presented.

Of course, "dicta from the Supreme Court is not something to be lightly cast aside." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). But it remains non-binding, and some Supreme Court dicta is less weighty than others. *Id.* (contrasting "subordinate clause, negative pregnant, devoid-of-analysis, throw-away kind of dicta[]" with "well thought out, thoroughly reasoned, and carefully articulated analysis by the Supreme Court describing the scope of one of its own decisions.") The *Heller* and *Bruen* dicta are the former sort. They are not part of the Court's "carefully articulated analysis." *Schwab*, 451 F.3d at 1325. Rather, this dicta either limits the questions presented in *Heller* and *Bruen*, or, in the case of the "longstanding prohibitions" passage, is a precautionary statement that does not employ either the textual or historical analyses set out in *Heller* and *Bruen*.

---

[3]Some "have speculated that it was compromise language designed to secure Justice Kennedy's vote." Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L. J. 1372, 1372 (2009).

"To the extent [an] opinion says one thing but does another, what it does is the holding of the decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1265 (11th Cir. 2007). No matter how often the Supreme Court has repeated the "law-abiding citizen" qualifier, or opined about felon dispossession laws, it has never applied its text-and-history analysis to such laws. Hence, these statements are non-binding, and provide little guidance.

### D. *Bruen* Abrogated *United States v. Rozier*, 598 F.3d 768 (11th Cir. 2010).

Notwithstanding that *Heller* and *Bruen*'s use of "law-abiding citizens" and "longstanding prohibitions" was clearly dicta, *Rozier* undeniably found § 922(g)(1) constitutional when it elevated the *Heller* dicta to Circuit law. But *Bruen* abrogated *Rozier* in two overlapping ways—one methodological, and one substantive.

Methodologically, *Bruen* abrogated *Rozier* by employing a test that *Rozier* clearly did not use, which leads to a different holding than the one *Rozier* reached. Generally, an intervening decision of the Supreme Court must be "clearly on point" to "overrule the decision of a prior panel of [this] court[.]" *Garrett v. University of Alabama at Birmingham Bd. of Trustees*, 344 F.3d 1288, 1292 (11th Cir. 2003). But not every distinction between an intervening decision and prior panel precedent makes that intervening decision not "clearly on point."

23

This Court has held "where the Supreme Court has clearly set forth a new standard to evaluate" a legal issue, prior Circuit precedent addressing that issue "has been undermined to the point of abrogation and [this Court] is bound to follow th[e] new rule of law." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). This understanding of abrogation was essential to its holding that, by announcing a new standard, *Begay v. United States*, 553 U.S. 137 (2008) had abrogated *United States v. Gilbert*, 138 F.3d 1371 (11th Cir. 1998) on the issue of whether unlawfully carrying a concealed weapon qualified as a U.S.S.G. §4B1.2 crime of violence, even though carrying a concealed weapon was not the predicate offense at issue in *Begay*.

Likewise, *Bruen* abrogated *Rozier* by announcing a new Second Amendment standard that *Rozier* did not apply and that dictates a different result than the one *Rozier* reached, even though *Bruen* did not involve § 922(g)(1). Prior to *Bruen*, the Supreme Court "ha[d] not definitively resolved the standard for evaluating Second Amendment claims." *Silvester v. Becerra*, __U.S.__, 138 S.Ct. 945, 947 (2018) (Thomas, J., dissenting from cert. denial). *Rozier*, 598 F.3d at 770, sought to fill this void by asking "whether one is qualified to possess a firearm." It based its test on the Court's statement in *Heller*: " '[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register

24

his handgun and must issue him a license to carry it in the home.' " *Id.* (quoting

*Heller*, 554 U.S. at 635). It then interpreted the *Heller* statement on "longstanding

prohibitions" as indicating that felons were "disqualified." *Rozier*, 598 F.3d at 771.

*Bruen*, however, established a different test. It held:

> When the Second Amendment's plain text covers an
> individual's conduct, the Constitution presumptively
> protects that conduct. The government must then justify
> its regulation by demonstrating that it is consistent with
> the Nation's historical tradition of firearm regulation.
> Only then may a court conclude that the individual's
> conduct falls outside the Second Amendment's
> "unqualified command."

*Id.* at 2129-2130 (citation omitted.) In creating a new test, which, as argued below,

~~dictates a different result than the one reached in *Rozier*, *Bruen* "undermined"~~

~~*Rozier* "to the point of abrogation . . . ." *Archer*, 531 F.3d at 1352; *cf.* *United States*~~

*v. Files*, 63 F.4th 920, 928 (11th Cir. 2023) (although a legal test may not always be

strictly necessary to the holding, "no one thinks that when we do state a governing

rule — as we typically do — we do so gratuitously and unnecessarily.")

Substantively, some claim that *Bruen* only overruled the means-ends

balancing step that most courts employed. *See, e.g*, Gov't Br., *United States v.*

*Deonta Lowe*, No. 22-13251, 40-41[4] (11th Cir. Apr. 6, 2023). Accordingly, the

25

argument goes, *Bruen* could not have abrogated *Rozier*, since *Rozier* did not balance the ends and means to reach its result.

It is true, *Bruen* began its analysis by outlining how the courts of appeal "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny[,]" and then rejecting the means-end balancing step as "one step too many." *Bruen*, 142 S.Ct. at 597 U.S. at 17-19. If *Bruen*'s analysis had ended there, it may be correct to conclude that it did not abrogate *Rozier*.

But *Bruen*'s holding was not so limited. *Bruen* did not simply strike down means-end scrutiny, and leave to the lower courts the task of formulating a new test. It affirmatively established the test to be used: (1) does "the Second Amendment's plain text cover[] an individuals conduct[?]"; and, if so, (2) can the government show the regulation "is consistent with the Nation's historical tradition of firearm regulation[?]" *Id*. at 2129-2130 (citation omitted.)

*Rozier* read into *Heller* an additional step that asks "whether one is qualified to possess a firearm." 598 F.3d at 770. But under *Bruen*, the *only* two bases for determining that persons are "disqualified," *Rozier*, 598 F.3d at 771, from firearm possession are either the plain text of the Second Amendment or the traditional, founding-era firearms regulations.

26

*Rozier*'s "disqualification" test was not, and did not purport to be, either a
textual analysis of whether felons are among "the people," or an historical analysis
of whether they were traditionally barred from firearm possession. Instead, this
Court determined that "Rozier's Second Amendment right to bear arms is not
weighed in the same manner as that of a law-abiding citizen[,]" pointed to the dicta
in *Heller*, and found § 922(g)(1) constitutional. *Rozier*, 598 F.3d at 771. Because
*Rozier* found § 922(g)(1) constitutional based on a carveout of non-law-abiding
citizens that did not accord with either step of the *Bruen* test, *Bruen* abrogated
*Rozier*.

### E. The Plain Text of the Second Amendment Covers Possessing Firearms.

#### i. The Text

*Bruen*, 597 U.S. at 17, held "that when the Second Amendment's plain text
covers an individual's conduct, the Constitution presumptively protects that
conduct." Monroe is imprisoned for possessing a Firearm – the conduct proscribed by
18 U.S.C. § 922(g)(1).

The question, therefore, is whether the plain text of the Second Amendment covers
possessing firearms.

27

"To Keep and Bear." *Bruen*, 597 U.S. at 59-60, clarified that "to keep and bear" arms includes carrying a firearm outside of the home.

"Arms." "Arms" include "weapons of offense or armour of defense." *Heller*, 554 U.S. at 581. This includes firearms ‑‑‑‑‑‑‑‑, which existed when the Second Amendment passed. *See* "pistol," Wikipedia, https://en.wikipedia.org/wiki/Pistol (last visited Jan. 19, 2024) ("The word 'pistol' is derived from the Middle French pistolet (c. 1550), meaning a small gun or knife, and first appeared in the English language c. 1570 when early handguns were produced in Europe.")

"The People." One point of contention in recent Second Amendment litigation is whether felons (or other statuses Congress sought to disarm) count as among "the people" within the meaning of the Second Amendment. However, strictly speaking, "*Bruen* step one requires us to look at the 'conduct' being regulated, not the status of the person performing the conduct." *United States v. Bullock*, No: 3:18-CR-165-CWR-FKB, __F.Supp.3d__, 2023 WL 4232309, *45 (S.D. Miss. June 28, 2023). Hence, the constitutional meaning of the term "the people" is irrelevant to *Bruen*'s first step. Whether or not "the people" excludes felons, law-abiding citizens, or other categories, is immaterial to whether the plain text of the

16

Second Amendment "covers an individual's *conduct*[.]" *Bruen*, 597 U.S. at 24 (italics added).

At any rate, a plain reading of the constitutional phrase "the people" does not purport to exclude felons. Founding-era dictionaries defined "people" to encompass the entire political community. *See* Thomas Dyche & William Pardon, A NEW GENERAL ENGLISH DICTIONARY (14th ed. 1771) ("signifies every person, or the whole collection of inhabitants in a nation or kingdom."); Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ("the body of persons who compose a community, town, city or nation.")

  ii.  *Heller*'s Interpretation of the Text

In *Heller*, 554 U.S. at 580-81, the Supreme Court entertained a "strong presumption" that this text refers "to all members of the political community, not an unspecified subset[,]" which is the "unambiguous[]" meaning of the term in "all six other provisions of the Constitution that mention 'the people[.]' " The Court noted that the Constitution uses "right of the people" in three places – the First Amendment's assembly and petition clause, the Fourth Amendment's search and seizure clause, and the Second Amendment. *Id*. at 579. It concluded "the people" means the same thing in all three places – the plain meaning of that term at the time it was adopted. *Id*. To hold that the Second Amendment excludes convicted

29

felons would thus lead to the absurd conclusion that the First Amendment and Fourth Amendment also exclude felons. *Id*. at 581.

This Court and others agree. In a different context, this Court stated felons are "indisputably part of 'the people.' " *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (finding bar on unlawful immigrants possessing firearms does not violate Second Amendment because consistent with history and traditions); *see also Range*, 69 F.4th at 101-103 (rejecting "contention that only 'law-abiding citizens' are among 'the people' protected by the Second Amendment."); *cf. United States v. Meza-Rodriguez*, 798 F.3d 664, 672 (7th Cir. 2015) ("we see no principled way to carve out the Second Amendment and say that the unauthorized (or maybe all noncitizens) are excluded.")

### iii.    Individual Rights And Collective Rights

Significantly, *Heller* did not say, as the government has argued elsewhere that "all members of the political community" means, or is otherwise coextensive with, only those who possess the right to vote or serve on a jury. *See, e.g.*, Gov't Br., *Lowe*, No. 22-13251, at 42-49. Quite the opposite. *Heller* held that, as used in the Second Amendment, "the people" includes "all Americans" and everyone who is "part of [the] national community." *Id*. at 580-81. And *Bruen* reaffirmed that "all Americans" enjoy Second Amendment rights. 142 S. Ct. at 2156. *See also Bullock*,

2023 WL 4232309, at *46 ("*Heller* also answered, for purposes of step one, whether the Second Amendment covers the so-called 'national community,' or a subset of the Nation called the 'political community.' It chose the broader definition[.]") Felons, of course, meet this definition.

But even if the Court defines "the people" as only the "political community," that phrase still encompasses felons. *Heller* contrasts two different sets of constitutional provisions that refer to "the people." First, as mentioned above, several constitutional amendments (the First, Second, Fourth, and Ninth) protect a "right" of "the people." *Heller*, 554 U.S. at 579. As used in these provisions, "the people" refers to "individual rights" that are "exercised individually and belong[] to all Americans," *i.e.*, "all members of the political community." *Id.* at 579-81.

Second, three other passages mention " 'the people' in a context other than 'rights.' " *Id.* at 579. These latter provisions "refer to 'the people' acting collectively" and "deal with the exercise or reservation of powers." *Id.* at 579-80. To the extent *this* usage of "the people" involves "rights" at all, they are not "individual rights," but rather " 'collective' rights" that "may be exercised only through participation in some corporate body." *Id.* at 579.

Among the constitutional provisions that use "the people" collectively is Article I, § 2, which "provid[es] that 'the people' will choose members of the House

31

[of Representatives]." *Id.* at 579. Voting, in other words, is a collective power (second category), not an individual right (first category). The civic right to vote, as then-Judge Barrett explained, "is held by individuals, but they do not exercise it for their own sake; rather, they cast votes as part of the collective enterprise of self-governance. Similarly, individuals do not serve on juries for their own sake, but as part of the collective enterprise of administering justice." *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting).

The distinction between individual rights (like the right to bear arms) and collective powers (like voting) was the crux of *Heller*'s holding that the arms right is not limited to militia service. *Heller* held that the right to bear arms is an individual right, unconnected to a collective, civic enterprise like militia service. *See State v. Roundtree*, 952 N.W.2d 765, 787 (Wis. 2021) (Bradley, J., dissenting) (explaining that reliance on "collective" rights such as voting "is entirely misplaced in construing the Second Amendment," which codifies an "individual right[]"). Therefore, the government's power to disenfranchise certain categories of people does not imply a power to disarm them.

iv.    Misplaced Historical Sources

One of the sources sometimes cited for tying "the people" to collective rights is a late 19th Century treatise by Thomas Cooley. Thomas M. Cooley, *A Treatise on*

32

*the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1868)). But this was written too late to inform the meaning of "the people" when the Constitution was ratified 75 years before. And it does not mention the right to bear arms. The other common source was a book written in 1998 that does not purport to define "the people." Akhil Reed Amar, THE BILL OF RIGHTS, 48 (1998).

More fundamentally, resort to these sources conflates the historical analysis of step two with the textual analysis of step one. Step one should not entail historical scholarship, and the Constitution did not give "the people" a technical, academic meaning. *Heller* advised that the Second Amendment's " 'words and phrases were used in their normal and ordinary as distinguished from technical meaning.' " 540 U.S. at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)). This "excludes secret or technical meanings that would not have been known to ordinary citizens in the founding generation." *Id.* at 577; *see United States v. Forbis*, No. 4:23-CR-0133, *6-7 (N.D. Okla. Aug. 17, 2023) (rejecting government's "attempt[] to add a historical tradition burden into *Bruen*'s first step . . . .")

The textual question is what "the people" meant to laypersons at the time. The historical question is whether, notwithstanding that it regulates conduct that founding-era laypersons would have understood to be covered by the Second

33

Amendment, section 922(g)(1)'s deprivation of that right is consistent with traditional founding-era regulations. Thus, even if the government could show that every state and colony barred felons from possessing firearms, this would not exclude them from "the people." It would mean the government met its burden at step two.

*Heller* concluded, based on the plain meaning of the constitutional text, that " ' 'the people' . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community.' " 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). It established "a strong presumption" that the Second Amendment "belongs to all Americans." Whatever one says about Americans convicted of felonies, they are still Americans. The text of the Second Amendment, therefore, plainly covers Monroes possession of a Fire arm

     v.     "The People" Includes the Non-law-abiding

It might be argued that the "law-abiding citizens" dicta qualifies the term "the people." But as demonstrated above, this claim does not withstand careful analysis. Again, neither *Heller* nor *Bruen* mentioned "law-abiding citizens" in connection with the textual and historical analyses that *Bruen* ultimately prescribed.

34

Moreover, limiting "the people" to "ordinary, law-abiding adult[s]," *Bruen*,

or "responsible, law-abiding citizens," *Heller*, is unworkable. "[T]he phrase 'law-

abiding, responsible citizens' is as expansive as it is vague." *Range*, 69 F.4th at 102.

Does it include "summary offenses," "petty misdemeanors," or "speeding tickets"?

*Id.* Need there even be a conviction? After all, "one doesn't need an adjudication

of guilt (or liability, or anything else) to have broken the law." Jeff Campbell, *There

is No Bruen Step Zero: The Law-Abiding Citizen and the Second Amendment*, 26 U.

D.C. L. Rev. 71, 80 (2023). Does law-abiding only implicate those who break a

*criminal* law? "Laws with civil penalties are laws just the same." *Id.* What about laws

with no penalties, like the health insurance mandate of the Affordable Care Act?

*Cf. California v. Texas*, ___U.S.___, 141 S.Ct. 2104, 2112 (2021) (requiring $0 penalty

for not obtaining health insurance).

On the other hand, if "felons" are the excluded category, would we apply

originalism to this term, and stick with common law and founding-era statutory

felonies? *Range*, 69 F.4th at 102. Traditionally, there were nine common law

felonies, and in 1765 when Blackstone wrote his *Commentaries*, there were 160

statutory felonies. Will Tress, *Unintended Consequences: Defining Felony in the

Early American Republic*, 57 Clev. St. L. Rev. 461, 464 (2009). "[F]elony" was not

well-understood when the Second Amendment was ratified. "According to James

35

Madison, 'felony' was 'a term of loose signification even in the common law of England,' but more so in the States where '[t]he meaning of the term . . . [was] not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws.' " *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (quoting THE FEDERALIST 42, at 228 (J.R. Pole ed., 2005)). Would we then have to apply the categorical approach to determine whether a definition of "the people" pegged to an originalist understanding of the terms "law-abiding" or "felon" encompassed some contemporary offense? *See Bullock*, 2023 WL 4232309, at *27 .

The Court in *Heller* thankfully avoided these problems by giving "the people" its ordinary broad meaning, and concluding that, at the time the Second Amendment was ratified, "the people" plainly referred to "all Americans." Similarly, this Court concluded "dangerous felons" are "indisputably part of 'the people.' " *Jimenez-Shilon*, 34 F.4th at 1046. As *Heller* makes clear, it is enough that Monroe is part of the national community of the United States, to conclude that he has an individual right to bear arms.

F. Barring All Felons From Possessing Firearms Is Inconsistent with the Relevant Historical Tradition of Firearms Regulations.

Because the plain text of the Second Amendment contravenes § 922(g)(1), the government bears the burden of demonstrating that § 922(g)(1) is consistent

36

with the historical tradition of firearms regulations in this country. *Bruen* made three points clear about what the government must show: (1) the extent to which those laws must resemble § 922(g)(1) depends on the novelty of the problem § 922(g)(1) is designed to address; (2) the laws relevant to a federal regulation are those that existed around the time the Second Amendment was ratified in 1791; and (3) several outlier laws do not establish a "tradition." The history adduced thus far in support of the constitutionality of § 922(g)(1) in cases around the country fails to meet each of these requirements.

i. The Historical Tradition Must Be *Distinctly* Similar to § 922(g)(1).

What the government must show to satisfy its burden depends on whether the challenged regulation addresses a new societal problem, or a societal problem that the founding generation would have understood. *Id.* at 2131-2133. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly* similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26 (italics added). Similarly, "if earlier generations addressed the societal problem through *materially different means*, that also could be evidence that a modern regulation is unconstitutional." *Id.* (italics added.) But laws "implicating unprecedent societal concerns or dramatic

37

technological changes may require a more nuanced approach." *Id.* at 2132. Such

unprecedented concerns do not require such a "distinct[] similar[ity]," as long as

"the two regulations are 'relevantly similar.' " *Id.* at 2131, 2133 (citation omitted.)

In sum, laws addressing an age-old societal problem require closer historical

analogues than those addressing a novel, modern one. *Id.*

Felon disarmament is a modern response to an ancient problem. The

potential dangerousness of felons was known to the founders. Before the

Revolution, many colonies were heavily populated with convicts exported there by

England. Encyclopedia of Virginia, *Convict Labor During the Colonial Period*,

available at: https://encyclopediavirginia.org/entries/convict-labor-during-the-

colonial-period/ (last visited August 15, 2023) (noting that, as of 1776, Virginia

alone housed at least 20,000 British convicts). Benjamin Franklin once wrote a

satirical article proposing that the colonies send rattlesnakes to England in return

for the thousands of convicts England was re-settling in the colonies. *See* Bob

Ruppert, "The Rattlesnake Tells the Story," Journal of the American Revolution (Jan.

2015).

Hence, the government must prove a "distinctly similar" tradition of firearms

regulations. *Bruen*, 597 U.S. at 26. When used in an adjectival phrase, "distinctly"

means "in a way clear to the mind or perception; clearly, unmistakably, decidedly,

38

indubitably." OXFORD ENG. DICT, Available at: https://www.oed.com/view/Entry/55681?redirectedFrom=distinctly#eid (last viewed Aug. 25, 2023). A vague similarity or rough analogy between § 922(g)(1) and some other tradition of firearms regulations is not similar enough to conclude that § 922(g)(1) passes muster under the Second Amendment.

This is significant because it has been argued that the government could meet its burden based on laws barring firearms from different subsets of people – such as slaves, Native Americans, Catholics, persons who supported an outspoken preacher in the 1630s, those who spoke ill of an act of the Continental Congress, those who had been insufficiently supportive of the Revolution, and persons, such as Quakers, who refused to take a loyalty oath. *Cf.* Gov't Br., *Lowe*, 22-13251, *supra* at 50-56. The argument was that these laws are relevantly similar to § 922(g)(1) because they were all premised on a similar belief that the disarmed groups could not be trusted to abide by the law. *Id.*

Implicit in this comparison is that these historical analogues, as well as § 922(g)(1) "address[] a general societal problem that has persisted since the 18th century." *Bruen*, 597 U.S. at 26. Indeed, there is nothing new in the concern about untrustworthy persons possessing firearms. But this fact means that "[t]he lack of a *distinctly* similar historical regulation addressing that problem is relevant

39

evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (italics added.) With such an age-old problem, a vague similarity cannot suffice. On the other hand, even if these disarmament examples were taken to be more than outliers, they show that the English and early American authorities addressed the problem of untrustworthy persons "through materially different means" – disarming groups based on their race, religion, or political loyalties. *Bruen*, 597 U.S. at 26.

Certainly, the similarity cannot be at such an abstract level that it could apply to virtually any law. But that is the level at which the history of disarming distinctly different groups relates to felon disarmament. If this abstraction is enough to provide constitutional cover to § 922(g)(1), it is difficult to conceive of any limit to who a legislature could not disarm. Particularly in times of social upheaval, one can imagine all kinds of nefarious laws directed at various disfavored groups. If perceived untrustworthiness, unvirtuousness, or some other abstract characteristic, is all that is required, then the Second Amendment stands down whenever any majority of a given legislature, or some other rule-making body or person, labels a disfavored group with such a characteristic. *Cf. Rahimi*, 61 F.4th at 453 ("[T]he Government's argument reads the Supreme Court's 'law-abiding' gloss so expansively that it risks swallowing the text of the amendment.")

40

Indeed, if the only throughline connecting modern felon disarmament laws to the smattering of disarmament laws over the course of four centuries is the fact that some authority found these groups to be untrustworthy, this would justify even the New York special justification law struck down in *Bruen*. This law undoubtedly stemmed from the implicit belief that those without a special justification could not be trusted with firearms. In this way, failing to require a more meaningful connection between a challenged law and the historical consensus would replicate the type of subjective means-end analysis that *Bruen* struck down, albeit under a less candid framework whereby lawyers and judges find in the history whatever they are looking for, by simply abstracting to the needed level of generality.

ii. The Tradition of Similar Laws Must Have Existed Around the Time the Second Amendment Was Ratified.

"[N]ot all history is created equal." *Bruen*, 597 U.S. at 34. The history is only relevant to the extent it enlightens the public understanding of the Second Amendment around the time it was ratified. *Id*; *Heller*, 554 U.S. at 634–635. *Heller* considered "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century[.]" 554 U.S. at 605. *Bruen* discussed the relevant time frame in more detail. The closer to the time the Second

41

Amendment was ratified, the more force it has. It explained " '[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them.' " 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–635).

Bruen thus distinguished between ancient practices that " 'prevailed up to the 'period immediately before and after the framing of the Constitution[]' " and those "that had become 'obsolete in England at the time of the adoption of the Constitution' and never '[were] acted upon or accepted in the colonies.' " 597 U.S at 35 (citations omitted.) It likewise instructed courts to "guard against giving postenactment history more weight than it can rightly bear." *Id.* Both decisions specifically discounted "post-Civil War discussions of the right to keep and bear arms" which " 'took place 75 years after the ratification of the Second Amendment,' " and therefore " 'do not provide as much insight into its original meaning as earlier sources." *Bruen*, 597 U.S. at 36 (quoting *Heller*, 554 U.S. at 614); *cf. Sprint Communications Co., L.P. v. APCC Services, Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C. J., dissenting) ("The belated innovations of the mid- to late- 19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]")

Federally, Congress enacted the precursor to 18 U.S.C. § 922(g) in 1938, which only applied to certain felons. *United States v. Booker*, 644 F.3d 12, 24 (1st

42

Cir. 2011). It expanded the proscribed category to all felons in 1961. *Id.* And it changed the operative verb from "receive" to "possess" in 1968. *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010).[5]

Thus, § 922(g) itself, enacted 150 years after ratification, came far too late to conclude that felon disarmament was consistent with the founding generation's understanding of the scope of the Second Amendment's protections. *Bruen* explained what to do with more recent precedents: "to the extent *later* history contradicts what the text says, the text controls." *Id.* at 2137 (italics added.)

      iii.    The Relevant History Must Reveal More Than a Few Similar Laws.

The government must show an historical "tradition" of analogous firearms regulations. *Bruen*, 597 U.S. at 17. A few outliers will not do. The Court "doubt[e]d that three colonial regulations could suffice to show a tradition of public-carry regulation." *Id.* at 46; *see also Heller*, 554 U.S. at 632 (declining to "stake our interpretation of the Second Amendment upon a single law, in effect in a single

---

[5] Moreover, even if the government uncovered a wealth of historical sources that the scholars have missed, establishing a founding-era tradition of barring felons from possessing firearms, it is worth noting that the category of offenses deemed felonies has drastically expanded since that time, calling into question whether the modern conception of "felon" accurately reflects the actual historical tradition. *See, e.g., Folajtar v. Attorney General*, 980 F.3d 897, 904 (3rd Cir. 2020) ("A felony unquestionably encompasses a broader array of crimes today than it did in 1791.")

43

city, that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense of the home.")

With respect to felon disarmament laws, the relevant consensus simply does not exist. After thoroughly combing the historical record, the scholarly consensus is that the historical record does not reveal *any* laws on the books proscribing the possession of firearms by felons until the 20th Century. As one historian wrote, after he searched all existing printed session laws of the first fourteen states year by year from 1607 to 1815, he couldn't find 'a single instance in which these jurisdictions exercised a police power to prohibit gun ownership by members of the body politic.' " *United States v. Quiroz*, 629 F.Supp.2d 3d 511, 519 (W.D. Tex. 2022) (quoting Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*: The Legal Context of the Second Amendment, 25 L. & HIST. REV. 139, 157 (2007)). Moreover, "it wasn't until 1886 that a state court ruled on a firearm regulation that regulated 'the condition of a person—rather than directly regulating his manner of carrying.' " *Id.* at 520 (quoting C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 HARV. J. L. & PUB. POL'Y 695, 711 (2009)); *see also Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (after reviewing historical record, concluding that no "historical practice supports a legislative power to categorically disarm felons because of their status as felons."); Carlton F.W. Larson,

44

*Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse*

*Dixit*, 60 Hastings L. J. 1371, 1374 (2009).

*Bruen*, 597 U.S. at 38, concluded:

> [a]part from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense.

Similarly, notwithstanding laws disarming various groups of people, most commonly slaves, starting in the 17th century, there is no historical evidence of felon disarmament laws until the 20th century. Just as New York could not establish an historical tradition justifying its special circumstances licensing regime in *Bruen*, the government cannot "demonstrate a tradition of broadly prohibiting" felons, or non-law-abiding persons generally, from bearing arms. *Id.*

    iv.   The Second Amendment Was Adopted to Counter Disarmament Laws, Not Embrace Them.

Far from justifying § 922(g)(1), the categorical disarming of unpopular groups led directly to the right to bear arms. In England, the people became heavily armed during their 17th Century civil wars. David E. Vandercoy, *The History of the Second Amendment*, 28 Val. U. L. Rev. 1007, 1015 (1994). After the Restoration of the

45

monarchy, King Charles II began to disarm "disaffected persons" with the Militia Act of 1661. *Id.* at 1016. With the Game Act of 1671, he dramatically limited the right to hunt and barred possessing firearms by non-hunters. *Id.* King James II continued the disarmament policy, amassed a standing army, and replaced Protestants with Catholics at high government posts. *Id.* at 1016-1017. This culminated in the Glorious Revolution, when James II fled upon Prince William III landing in England with an army. *Id.* at 1017. A special parliament crowned William and Mary as co-sovereigns and adopted the Declaration of Rights of 1689. *Id.* An early draft of the Declaration of Rights recited the abuses of James II, including his disarming of Protestant subjects. *Id.* at 1018. The final version set forth the positive right of Protestant subjects to have arms for their defense, and "as allowed by law" — a phrase referring to how arms were used, not as a limitation on possession. *Id.*; *see* 1 W. & M., Sess. 2, ch. 2 (1689).

Similarly, in the run-up to the Revolutionary War, King George III "began to disarm inhabitants of the most rebellious areas[]" of the Colonies. *Heller,* 554 U.S. at 594. Given this history, "by the time of the founding," the right to bear arms was "understood to be an individual right protecting against both public and private violence." *Id.* It was designed to safeguard "the people" from such categorical disarmaments.

46

This Court should not accept any invitation to rely on laws of the same sort as those that led to the Second Amendment, and to its precursor in the English Declaration of Rights, to demonstrate that such laws are consistent with the historical tradition surrounding the Second Amendment. Such a rationale turns the Second Amendment on its head. It would permit disarming some politically unpopular subsets of "the people" who may need the Second Amendment's protections the most, during the times they might be at most risk from an oppressive government or an unruly mob. This Court should reject any argument that the disarmament of various disfavored categories of people in Anglo-American legal history constitutionalizes § 922(g)(1). The Second Amendment does not permit disarming a group of people based only on the fact that someone, or some legislature, at some point, decided to disarm an entirely different category of people, based on that group's perceived untrustworthiness or lack of virtue. It was designed precisely to prevent such laws.

v.      Unratified Drafts of the Second Amendment Are Irrelevant.

Some have pointed to several drafts of the Second Amendment floated during the ratifying conventions, which would have explicitly permit certain disarmament laws. *Bullock*, 2023 WL 4232309, at *49. Needless to say, this language was not ratified. The fact that a draft or provision was left on the cutting

47

room floor implies that the final version of the law purposefully did not include this provision. And even if they had the force of law, a few drafts do not establish a custom. *Cf. Bruen*, 142 S.Ct. at 46. Finally, none of these drafts would have categorically disarmed felons.

In sum, the government cannot come close to meeting its burden. The only possible precedents for felon disarmament are a smattering of laws in England and the United States, of which only a handful existed in the relevant time frame. These laws bear only a vague resemblance to 18 U.S.C. § 922(g)(1), in that they disarm various groups (but not felons) based on perceived untrustworthiness. And instead of complementing the Second Amendment, such disarmament laws are what prompted the adoption of the Second Amendment and its English predecessor. This Court must, therefore, hold that § 922(g)(1) violates the Second Amendment.

II.    EVEN IF § 922(g)(1) CAN CONSTITUTIONALLY APPLY UNDER SOME CIRCUMSTANCES, IT IS UNCONSTITUTIONAL AS APPLIED TO Monroe

A law is facially unconstitutional if "no set of circumstances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). As shown above, under no circumstances would a law that bars a person from possessing a firearm by virtue of their status as a felon, be valid. Even assuming otherwise, the law is unconstitutional as applied to Monroe.

48

It might be argued that a stronger historical record supports a firearm possession bar on some subset of felons. But even if barring firearm possession by a subset of convicted felons has a stronger pedigree, that is not the law Congress enacted in 18 U.S.C. §§ 924(a)(2) and 922(g)(1). The fact that a person might qualify for some other hypothetical status with a stronger historical precursor does not change the law that the person was convicted of violating.

An offense comes with specific elements, and the offense Monroe was convicted of violating has only the status element of being a convicted felon. This element is not "divisible," in the parlance of the modified categorical approach. *Cf. Descamps v. United States*, 570 U.S. 254 (2013). It is not comprised of alternative, mutually exclusive elements, such as "dangerous felons" and "non-dangerous felons," that constitute separate offenses. Under no circumstances can a conviction under §§ 924(a)(2) and 922(g)(1) — at least the version of this offense that exists now and existed on the date of Monroe offense — withstand Second Amendment scrutiny, because by definition the offense does not involve a status other than "convicted felon." *Contrast GeorgiaCarry.Org, Inc, v. U.S. Army Corps of Engineers*, 788 F.3d 1318, 1323 n.3 (2015) (concluding regulation giving district commander discretion to grant written permission to individuals to carry firearms in

49

campground on federal land could not be facially overbroad, because it could be constitutional in cases where permission was granted).

Having said that, *Monroe* seeks to avoid forfeiting an argument that his conviction is unconstitutional as applied. Thus, even assuming the existence of some difficult-to-conceive circumstance under which §§ 924(a)(2) and 922(g)(1) could constitutionally bar a felon's possession of a firearm that renders it not *facially* overbroad, it is unconstitutional as applied to *Monroe.* The elements of *his* offense are "(1) a status element[,]" in his case, being a convicted felon, "(2) a possession element (to 'possess'); (3) a jurisdictional element ('in or affecting commerce'); . . . (4) a firearm element (a 'firearm or ammunition')[;]" *Rehaif v. United States,* __U.S.__, 139 S.Ct. 2191, 2196 (2019) (quoting 18 U.S.C. § 922(g)), and (5) a "knowingly" *mens rea* extending to both the relevant status and to the possession. 18 U.S.C. § 924(a)(2); *Rehaif,* 139 S.Ct. at 2200.

These were the elements he assented to in pleading guilty. ⬚⬚⬚⬚⬚⬚ ⬚⬚⬚⬚ ⬚⬚⬚⬚⬚ ⬚⬚⬚⬚⬚⬚⬚ ⬚⬚⬚⬚ He made no admission to any other status, or characterization of him. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓. His conviction was based on his status as a felon, and there was no tradition around the time the Second Amendment was passed of barring

50

Persons with this status from possessing firearms. Section 922(g)(1) is therefore unconstitutional as applied to him.

Setting aside an elemental approach to the question and instead entertaining a more nuanced approach based on the nature of Monroe criminal record, there is No historical tradition justifying barring firearm possession by persons with a criminal history. For this reason, 922(g)(1)(922) and 924 are unconstitutional as applied to Monroe. RANGE, 69 F. 4th at 106 : U.S. v. QUAILES, No. 1:21-cr-00176 F.Supp.3d, 2023

For the foregoing reason(s) this court should reverse and vacate conviction and sentence, as it pertains to Felon in Possession charge(s) and sentence imposed for

This Honorable Cort has jurisdiction to correct a Sentence it imposed as to the constitutionally of that Sentence.

Respectfully Submitted,
Arthur Lee Monroe Jr